## STATE v. AMOS J. SANDEFUR.

82 N. W. (2d) 623.

April 26, 1957—No. 36,787.

*John L. Jewell,* for appellant.

*Miles Lord,* Attorney General, *Charles E. Houston,* Solicitor General, *John R. Murphy,* Assistant Attorney General, and *John J. McCarten,* County Attorney, for respondent.

THOMAS GALLAGHER, JUSTICE.

Appeal by defendant, Amos J. Sandefur, from a judgment of conviction for third-degree burglary. The charge relates to an unsuccessful attempt to rob a safe of the Osborn-McMillan Elevator Company in Alexandria during the night of January 1, 1955. At the trial the principal evidence upon which the jury convicted defendant was the testimony of James A. Weaver, a former employee of the Osborn-McMillan Elevator Company, who had been arrested and was convicted as an accomplice in the commission of the crime.

Defendant's appeal is based upon the ground that the evidence was insufficient to sustain the jury's verdict. It is defendant's principal contention that Weaver's testimony, being that of an admitted accomplice, lacks the corroboration essential to sustain a conviction under M. S. A. 634.04. This section provides:

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration

is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Weaver, now serving a sentence at the state prison, has submitted an affidavit, which is a part of the file herein, to the effect that his testimony at the trial was false. Therein he affirmed that defendant was not connected with the attempted burglary as he had testified; and that the reason he gave testimony to such effect was because of his hope that an habitual criminal charge, based upon his conviction of prior crimes, would not be pressed against him.

Evidence submitted and relied upon by the state as meeting the requirements of § 634.04 consisted of the testimony of police officers investigating the scene of the crime on the day following its commission to the effect that they had discovered footprints of two men leading to the elevator and back to an automobile which had been parked nearby, indicating that two men had participated in the attempted burglary. It is conceded that there was no evidence which connected either the automobile or footprints with defendant.

Evidence was also submitted that, after defendant was taken into custody, the captain of police of Alexandria had called upon him on January 17, 1955, and had then taken from him a written statement of his movements on January 1, 1955; that a carbon copy of this statement had been left with defendant; that shortly thereafter defendant asked a fellow prisoner, Harris S. Mithun, a cellmate of Weaver, to give the copy of the statement to Weaver. Mithun testified that at the time of this request defendant had told him to tell Weaver "to read it and stick to it." Defendant denied making this statement to Mithun and testified that he had forwarded the statement to Weaver through Mithun in response to a message from Weaver that the latter wished to know what defendant had told the police officer. This statement was as follows:

"On January 1st 1955 I was at Pletto's Hideout from 1 p. m. until about 8:45 p. m. Then I went to Lyle's Cafe and had one beer and then went to the State Theatre. I got out of the theatre about 11:20 p. m. or 11:30 p. m. I went back to Lyle's and had one beer with Art Affeldt, Gloria Engstrom and a few other. I left there

and I saw Clyde Collins car on the corner so I went into George's Cafe to talk to him. I left there at midnight when the placed closed and went home to bed.

"On Tuesday Jan. 4th James Weaver and I started for Billings, Montana. I left Weaver in Wyoming and went on to Billings, Mont. to see my friend. His name is Bill Davis. I arrived in Billings Jan. 6th and left about 3 or 4 o'clock the morning of the 7th on my way back to Alexandria. I arrived back in Alexandria Jan. 8th before day light.

\* \* \* \* \*

"A. J. Sandefur"

Testimony was also submitted that on the night of January 19, 1955, a police officer had found a pair of pliers with the initials OM stamped thereon in a car belonging to defendant's wife. The pliers were identified by an officer of the Osborn-McMillan Elevator Company as property of the latter which had disappeared from the elevator during the weekend in which the crime was committed. With reference thereto, defendant testified that on January 3, 1955, in the presence of a Mr. Nylander, he had picked up a pair of pliers on the sidewalk in front of the Shell cafe in Alexandria and had then left them in the car. The evidence disclosed that this car at various times before and after the crime had been driven by Weaver and others. Weaver testified that no pliers had been used at the time of the attempted burglary and that he had at no time seen the pliers submitted in evidence in the possession of defendant or otherwise until the trial.

On January 4, 1955, defendant and Weaver traveled together in the car to Wyoming and Montana. The court sustained objections to questions propounded defendant by his counsel as to the purpose of this trip on the ground that such evidence was immaterial. Weaver testified that he and defendant had journeyed to Billings, Montana, to afford defendant an opportunity of borrowing money from a friend of his there; that they had returned to Alexandria on January 9, 1955; and that defendant had been successful in borrowing some money from his friend at Billings. Shortly thereafter, Weaver and

defendant were arrested. Defendant at that time was charged with burglary in the third degree, but no charge for this offense was then made against Weaver.

Defendant took the stand in his own behalf. He denied having any association with Weaver in the attempted burglary. He admitted that he had known Weaver for some time and that they were together at times during the weekend of the burglary. He testified that Weaver had suggested that the burglary be attempted but that he had rejected the suggestion. There is nothing to show that he was in association with Weaver at the time the crime was committed or that they were seen together in the near vicinity thereof. See, State v. Star, 248 Minn. 571, 81 N. W. (2d) 94; State v. Pauley, 210 Iowa 192, 230 N. W. 555; Privett v. Commonwealth, 233 Ky. 471, 26 S. W. (2d) 3.

Defendant further testified that he was married, the father of two children, and engaged in the trucking business for some years past with a net income of approximately $450 per month. In addition, he submitted the testimony of a number of character witnesses from Alexandria who vouchsafed his good character and reputation.

He outlined in detail his whereabouts during the time in which the crime was being committed. This was to the effect that during the afternoon preceding the crime he had been at Pletto's Hideout, a "beer joint," from 1 p. m. to 8:45 p. m.; that from there, at about 8:45 p. m., he had driven the car home and parked it in back of his house; that he had then attended the State Theatre in Alexandria; that after the show he had first visited Lyle's cafe and named a number of people who were there at the time, although one of them testified she had not seen defendant; that he had then gone to Charlie's cafe where he had met and remained with Mr. and Mrs. Clyde Collins until the cafe closed; that they had then driven him to his home in their car; and that he had then gone to bed.

The testimony of Mrs. Clyde Collins and her husband substantiated this for the most part. Mrs. Collins testified that on the night of the burglary she and her husband had met the defendant about 11 p. m. in Charlie's cafe; that defendant then told her he

"had been home" that evening; that he remained with them until about 12:30 a. m.; that at that time she and her husband had driven him back to his house where he had left them; and that she had then seen the car which defendant drove parked near his home.

On January 17, 1955, Weaver was arrested for forgery and remained in custody for two months before a warrant was served upon him for the burglary involved here. It was finally served the day that his testimony was to be submitted at defendant's trial. No explanation was given as to the reason for this delay. The jury required 11 hours before agreeing upon a verdict of guilty. As indicated above, subsequent to his sentence, Weaver repudiated his testimony linking defendant to the crime.

It is the state's contention that the evidence submitted by it, as summarized herein, was sufficiently corroborative of Weaver's testimony to meet the requirements of § 634.04.

■ In construing § 634.04 this court has held that the reason for requiring that testimoy of an accomplice be bolstered by corroborative evidence is that such testimony is from one admittedly corrupt and therefore likely to have been given in the hope that by turning state's evidence clemency might be extended to the witness. We have also held that evidence to be sufficiently corroborative under § 634.04 must tend in some degree to establish the guilt of the accused and not merely relate to the commission of the crime and the circumstances thereof as distinct from defendant's connection therewith. State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Scott, 203 Minn. 56, 279 N. W. 832; State v. Jackson, 198 Minn. 111, 268 N. W. 924; State v. Korsch, 168 Minn. 354, 210 N. W. 10; State v. Baker, 161 Minn. 1, 200 N. W. 815; State v. Smith, 144 Minn. 348, 175 N. W. 689.

■ These well-established principles governing the application of § 634.04 would here seem to eliminate nearly all of the evidence relied upon by the state as sufficiently corroborative to justify conviction under this section. At the outset, it is clear that there is nothing in the evidence relating to the car tracks or the footprints observed at the place of the crime which linked them to defendant

in any way. Accordingly, under our decisions such evidence cannot be regarded as corroborative within the requirements of the statute. State v. Scott, *supra;* State v. Green, 153 Minn. 127, 189 N. W. 711; State v. Jacobson, 130 Minn. 347, 153 N. W. 845.

■ Likewise, neither defendant's statements made after his arrest nor testimony as to his actions with reference thereto can be regarded as within the concept of the corroborative evidence required by § 634.04. Giving full weight to Mithun's testimony that at the time defendant handed him the carbon copy of his written statement as above described defendant had requested that Mithun tell Weaver "to read it and stick to it," there is still a complete absence of evidence which would link defendant to the crime or which would be inconsistent with his normal desire that Weaver respect the truth of such statement and not change or distort it to save himself. The actions described can scarcely be held to constitute attempted bribery which this court held to be evidence of guilt in State v. Ettenberg, 145 Minn. 39, 176 N. W. 171. See, also, State v. Brin, 30 Minn. 522, 16 N. W. 406; cf. State v. Keith, 47 Minn. 559, 50 N. W. 691. That part of the statement which covered defendant's movements at about the time the crime was committed was substantiated in part at least by the testimony of reliable witnesses. Under all such circumstances, we must conclude that there is nothing in this evidence which would sustain defendant's conviction.

■ This leaves for consideration evidence relating to the pair of pliers belonging to the Osborn-McMillan Elevator Company found in the car owned by defendant's wife. The fact that these pliers disappeared during the weekend in which the burglary was attempted and were subsequently found in a car driven by defendant might, in the absence of other factors, be regarded as substantial enough corroboration to meet the requirements of the statute. However, other evidence and circumstances cast grave doubt upon its sufficiency to link defendant to the crime. Weaver testified that no pliers had been used or seen by him during the attempted burglary; that he had never seen any pliers in defendant's possession; and that he had not seen the pliers submitted in evidence at any time prior to the

trial. Defendant testified that he had found a pair of pliers on the sidewalk some two days after the burglary and had placed them in the car, evidence which might or might not have been corroborated by Nylander, an absent witness. After the crime, persons other than defendant, including Weaver, on occasion had driven the car in which the pliers had been found. See, State v. Zoff, 196 Minn. 382, 265 N. W. 34; see, also, 9 Am. Jur., Burglary, § 60.

When all of the foregoing evidence is considered in the light of Weaver's subsequent repudiation of his testimony and keeping in mind the requirements of M. S. A. 634.04, as well as the sound principles which we have repeatedly held applicable thereto, it would seem that only through the process of a new trial where a jury may give full consideration to all of the foregoing factors can justice be done.

Reversed and new trial granted.

DELL, CHIEF JUSTICE (dissenting).

I dissent. Defendant claims that the evidence is insufficient to sustain the jury's verdict. His real contention is that Weaver's testimony, being that of an accomplice, lacks the corroboration essential to sustain a conviction under M. S. A. 634.04. That is the only issue involved.

In the burglary the elevator was broken into and the combination of the safe was destroyed with a hammer. If Weaver's testimony is true, defendant not only joined in planning the crime but drove his automobile to the elevator and was the one who used the hammer in smashing the combination. The safe, however, could not be opened so as to get at the money. Weaver admits his part in the crime and was, therefore, to be considered an accomplice.[1] There is no question that a crime was committed nor can there be any doubt that two persons participated in the burglary for the evidence is clear that two separate and distinct sets of footprints were traced to and from the building. Defendant admitted that he had pressing financial obligations; that Weaver talked to him about burglarizing the "Osborn-McMillan" building and asked him "to go in with him on

[1]State v. Elsberg, 209 Minn. 167, 295 N. W. 913.

the deal." He claimed that he refused to join in the crime and told Weaver "if I was going to steal something it would be grand larceny and not petit larceny." From the evidence it is clear that property stolen in the burglary was found in defendant's automobile and placed there by the defendant himself. Defendant and Weaver were friends and associates. They had known each other for about three years. Weaver had previously stayed at defendant's home. Defendant conceded that they were together at St. Cloud on December 31, 1954, the day before the burglary. He also conceded that they were together on January 2, 1955, the day after the burglary, at which time he took Weaver to the Harvey Carroll place. Weaver claimed that he stayed at defendant's home in Alexandria between those dates during which time defendant's family was away, and that he left defendant's home on January 2 because the family was returning. Defendant denied that Weaver stayed with him during that period but it cannot be overlooked that he admitted his family was away at that time and that he took Weaver to Carroll's place the very day the family returned. And at one time during cross-examination, when defendant was asked whether Weaver didn't come to his home on the night of December 31, he testified "If he did I would not know nothing about it because I was served a Mickey at the liquor store."

Weaver testified that following the burglary they immediately drove to defendant's home where he remained because he knew he was wanted by the authorities on a charge of forgery. He said that defendant then went downtown. Defendant claimed an alibi. He testified that he was at a "beer joint" all afternoon and from there went that night to a show in Alexandria and after the show to a cafe where he had a "beer." He said that Clyde Collins and his wife drove him home from the cafe. The majority opinion completely ignores that portion of the crucial and devastating testimony given by Mrs. Collins as a state's witness. She not only testified that defendant told them that he had been at home that evening but that "He said he had been home sleeping and he couldn't sleep so he decided to take a walk." This testimony is wholly inconsistent with defend-

ant's statement given in writing to the police captain and set forth verbatim in the majority opinion as well as his testimony given at the trial concerning his movements the afternoon and evening of the day the crime was committed. It very effectively discredits, if not entirely destroys, his alibi. And the so-called "reliable witnesses" referred to in the majority opinion, as corroborating defendant's movements on the day the crime was committed, refer to his whereabouts at times of the day about which there is no dispute or any materiality. In his statement to the police captain defendant stated that on the night of January 1, at "Lyle's," he "had one beer with Art Affeldt, Gloria Engstrom and a few other" but Miss Engstrom, called as a state's witness, testified "I didn't see him in there." To me it seems obvious that the jury was justified in finding that defendant's alibi was unworthy of belief.

The 1949 Dodge in which the pliers were found by the officials belonged to the defendant. It was registered in his wife's name but was used by him. As to the ownership of the automobile he testified, "For technical reasons I had it listed in my wife's name but it was my money that made the down payment anyway." But it is unnecessary to concern ourselves with the ownership of the car and whether Weaver and others drove it for there need be no speculation as to how the pliers got into the automobile since defendant admits that he placed them there himself. And there is no question but what the pliers, found in the automobile by the police officials following the burglary, belonged to the Osborn-McMillan Elevator Company. The assistant manager definitely identified them as pliers which he purchased for the company approximately two months before the burglary and stamped them with the company's initials "OM" himself. Moreover, he testified that he saw them in the elevator on Friday, December 31, 1954; that the elevator was closed on January 1 and 2 and that the pliers were missing on Monday, January 3. Defendant testified that on January 3, 1955, in the presence of Mr. Nylander, he found the pliers on the sidewalk in front of the Shell Cafe and that he placed them in his automobile. The failure of the defendant to produce Nylander as a witness at the trial to

substantiate his claim militates against him. State v. Jansen, 207 Minn. 250, 256, 290 N. W. 557, 560. Defendant's testimony concerning the pliers and the manner in which he acquired possession of them is, to say the least, unconvincing.

Nor can I agree with the reasoning of the majority concerning defendant's conduct pertaining to the statement given by him to the police captain on January 17, 1955, for to me his conduct strongly militates against him. Defendant was kept in a cell on one floor of the jail and Weaver in a cell on another. Mithun had the run of the jail and performed chores on both floors. Mithun, referring to defendant, testified "He handed me a letter and told me to take it down to Weaver and tell him *to read it and stick to it.*" (Italics supplied.) Weaver corroborated Mithun's testimony and denied that it was he who asked for the statement. The jury could fairly infer, from what transpired regarding this episode, that defendant wanted to make certain that Weaver would have defendant's story, as given by him to the officials, in the hope that his alibi would stand up and that they could avoid implicating and contradicting each other.

The evidence of defendant's character and reputation is far from persuasive. The character witnesses are all of one family, trucker friends of the defendant, and one of them was an associate of both defendant and Weaver shortly after the commission of the crime. On the issue of defendant's credibility the record shows, by his own admission, that he had been convicted of a very serious crime in Montana. And it should not be overlooked that defendant and Weaver on January 4, three days after the burglary, left the state together.

Nor should the affidavit of Weaver, made in prison since the conviction, in which he attempts to repudiate his testimony at the trial, be given credence. The record shows that too much of the testimony given by him is true to permit it to be disregarded. It seems fair to assume that Weaver, who has quite a criminal record, realizes that he has little to lose and is simply trying to help his friend escape the consequences of his criminal act.

In construing § 634.04 this court has held that the reason for requiring the testimony of an accomplice to be corroborated is that it is the testimony of one admittedly corrupt and there is likelihood that it may have been given in the hope that by turning state's evidence he may receive clemency.[2] There must be corroborating evidence to support the testimony of the accomplice to aid in establishing his credibility. The rule is satisfied, however, if the corroborative evidence in some substantial degree tends to affirm the truth of his testimony and to point to the guilt of the defendant.[3] In State v. Rasmussen, 241 Minn. 310, 313, 63 N. W. (2d) 1, 3, we said:

"* * * It [the corroborative evidence] need not be sufficiently weighty that standing alone it would make out a prima facie case or sustain a conviction. The corroboration may come from the testimony of the defendant himself. Circumstantial evidence may be sufficient to corroborate the testimony of an accomplice. The entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient."

This court also stated in State v. Zoff, 196 Minn. 382, 383, 265 N. W. 34, 35:

"It appears to be well settled law that possession of stolen property is a circumstance from which guilt may be inferred. [Citing authorities.]"[4]

[2] State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Smith, 144 Minn. 348, 175 N. W. 689; State v. Jackson, 198 Minn. 111, 268 N. W. 924; State v. Scott, 203 Minn. 56, 279 N. W. 832.

[3] State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Briggs, 122 Minn. 493, 142 N. W. 823; State v. Christianson, 131 Minn. 276, 154 N. W. 1095; State v. Elsberg, 209 Minn. 167, 295 N. W. 913.

[4] See, also, Underhill, Criminal Evidence (4 ed.) § 628, where, relying upon and citing decisions from 26 states, it is stated: "If it appears that a burglary was in fact committed, the possession by the accused [of stolen property] is a circumstance from which, in connection with other evidence, the jury may infer that he committed it." See, 22 C. J. S., Criminal Law, § 597: "In many jurisdictions it is held that the possession of stolen prop-

The unsatisfactory nature of the defendant's testimony and its contradiction by other witnesses are corroborative in character within the meaning of § 634.04.[5]

Section 634.04, requiring corroboration of the testimony of an accomplice in order to sustain a conviction, was enacted as a shield to protect the innocent and not as a sword to be used against society in the hands of the guilty. One of the all-too-common enemies of decent citizens is the thief who breaks in and plunders in the nighttime while respectable people are asleep. The statute should not be given a strained construction so as to afford protection to the guilty as I believe is being done here. When considered in the light of the well-established principles governing the application of § 634.04, it seems clear to me that the testimony of Weaver was sufficiently corroborated by other evidence tending to convict the defendant of the commission of the offense to satisfy the statute and that the evidence as a whole was amply sufficient to justify the jury in convicting the defendant. This is not a case, as I see it, in which there should be a new trial in the interests of justice for it appears to me that justice has been accomplished.

MATSON, JUSTICE (dissenting).
I concur in the dissent of Chief Justice Dell.

KNUTSON, JUSTICE (dissenting).
I concur in the dissent of Chief Justice Dell.

---

erty may raise an inference or presumption of guilt in prosecutions for burglary, larceny, and robbery, * * *."

[5]State v. Brin, 30 Minn. 522, 16 N. W. 406.